# EWING, FEDERAL SECURITY ADMINISTRATOR, ET AL. *v.* MYTINGER & CASSELBERRY, INC.

No. 568.   Argued April 19–20, 1950.—Decided May 29, 1950.

*Robert L. Stern* argued the cause for appellants. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney, Philip Elman, Vincent A. Kleinfeld* and *William W. Goodrich.*

*Charles S. Rhyne* argued the cause for appellee. With him on the brief were *Lester L. Lev* and *J. E. Simpson.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is an appeal [1] from a three-judge District Court specially constituted on appellee's application for an injunction to restrain enforcement of a portion of an Act of Congress for repugnance to the Due Process Clause of the Fifth Amendment. [2]

Section 304 (a) of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1044, 21 U. S. C. § 334 (a), as amended, 62 Stat. 582, 21 U. S. C. (Supp. III) § 334 (a), permits multiple seizures of misbranded articles "when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency that the misbranded article is dangerous to health, or that the labeling of the misbranded article is fraudulent, or would be in a material respect misleading

[1] 62 Stat. 928, 961, 28 U. S. C. §§ 1253, 2101.
[2] 62 Stat. 968, 28 U. S. C. §§ 2282, 2284.

to the injury or damage of the purchaser or consumer." [3]

Appellee is the exclusive national distributor of Nutri-lite Food Supplement, an encapsulated concentrate of alfalfa, water cress, parsley, and synthetic vitamins combined in a package with mineral tablets. There is no claim that the ingredients of the preparation are harmful or dangerous to health. The sole claim is that the labeling was, to use the statutory words, "misleading to the injury or damage of the purchaser or consumer" and that therefore the preparation was "misbranded" when introduced into interstate commerce.

·This was indeed the administrative finding behind eleven seizures resulting in that number of libel suits, between September and December, 1948. The misbranding, it was found, resulted from the booklet which

---

[3] The provision of which the quoted portion is a part reads as follows:

"Any article of food, drug, device, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of section 404 or 505, be introduced into interstate commerce, shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States within the jurisdiction of which the article is found: *Provided, however,* That no libel for condemnation shall be instituted under this Act, for any alleged misbranding if there is pending in any court a libel for condemnation proceeding under this Act based upon the same alleged misbranding, and not more than one such proceeding shall be instituted if no such proceeding is so pending, except that such limitation shall not apply (1) when such misbranding has been the basis of a prior judgment in favor of the United States, in a criminal, injunction, or libel for condemnation proceeding under this Act, or (2) when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency that the misbranded article is dangerous to health, or that the labeling of the misbranded article is fraudulent, or would be in a material respect misleading to the injury or damage of the purchaser or consumer."

accompanied the preparation.[4] Shortly thereafter the present suit was instituted to have the multiple seizure provision of § 304 (a) declared unconstitutional and to

[4] The booklet, *How to Get Well and Stay Well,* is used by salesmen in soliciting prospective customers. A version of the booklet in use in 1947 represented that Nutrilite had "cured or greatly helped" such "common ailments" as "Low blood pressure, Ulcers, Mental depression, Pyorrhea, Muscular twitching, Rickets, Worry over small things, Tonsilitis, Hay Fever, Sensitiveness to noise, Underweight, Easily tired, Gas in Stomach, Cuts heal slowly, Faulty vision, Headache, Constipation, Anemia, Boils, Flabby tissues, Hysterical tendency, Eczema, Overweight, Faulty memory, Lack of ambition, Certain bone conditions, Nervousness, Nosebleed, Insomnia (sleeplessness), Allergies, Asthma, Restlessness, Bad skin color, Poor appetite, Biliousness, Neuritis, Night blindness, Migraine, High blood pressure, Sinus trouble, Lack of concentration, Dental caries, Irregular heartbeat, Colitis, Craving for sour foods, Arthritis (rheumatism), Neuralgia, Deafness, Subject to colds." This version is the basis for an indictment now pending in the Southern District of California charging Lee S. Mytinger and William S. Casselberry with the misbranding of Nutrilite in violation of the Federal Food, Drug, and Cosmetic Act.

After a hearing prior to the indictment, appellee revised the booklet. Direct curative claims were eliminated. But pages 41–52 of the revised booklet were devoted to case histories explaining that Nutrilite brought relief from such ailments as diabetes, feeblemindedness, stomach pains, sneezing and weeping. Appellant Crawford, Associate Commissioner of Food and Drugs, concluded that there was probable cause to believe and that he did believe that this version of the booklet was misleading. On September 28 and 30, 1948, he recommended seizures of Nutrilite shipments.

Appellee thereafter ordered its salesmen to remove pages 37–58 which contained the case histories. The pages which remained pointed to the dangers and prevalence of illness, described the discovery of Nutrilite, and recommended the booklet to those who wanted to get well and stay well. On December 2, 1948, appellant Larrick, Assistant Commissioner of Foods and Drugs, made a probable cause determination on these pages of the booklet and recommended seizure.

Six new pages were thereafter added to the booklet. On December 9, 1948, appellant Dunbar, Commissioner of Foods and Drugs, made a probable cause determination on that version of the booklet and recommended further seizures.

dismiss all libel cases except the first one instituted. The District Court held that appellants had acted arbitrarily and capriciously in violation of the Fifth Amendment in instituting multiple libel suits without first affording the appellee a hearing on the probable cause issue; that the multiple seizure provision of § 304 (a) was unconstitutional under the Due Process Clause of the Fifth Amendment; and that appellants should be permanently enjoined from instituting any action raising a claim that the booklet accompanying the preparation was a misbranding since it was not fraudulent, false, or misleading. 87 F. Supp. 650.

*First.* The administrative finding of probable cause required by § 304 (a) is merely the statutory prerequisite to the bringing of the lawsuit. When the libels are filed the owner has an opportunity to appear as a claimant and to have a full hearing before the court.[5] This hearing, we conclude, satisfies the requirements of due process.

At times a preliminary decision by an agency is a step in an administrative proceeding. We have repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective. See *Lichter* v. *United States,* 334 U. S. 742; *Inland Empire Council* v. *Millis,* 325 U. S. 697; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126.

But this case does not go as far. Here an administrative agency is merely determining whether a judicial proceeding should be instituted. Moreover, its finding of probable cause, while a necessary prerequisite to multiple seizures, has no effect in and of itself. All pro-

---

[5] Sec. 304 (b) provides in part:

"The article shall be liable to seizure by process pursuant to the libel, and the procedure in cases under this section shall conform, as nearly as may be, to the procedure in admiralty; except that on demand of either party any issue of fact joined in any such case shall be tried by jury."

ceedings for the enforcement of the Act or to restrain violations of it must be brought by and in the name of the United States. § 307. Whether a suit will be instituted depends on the Attorney General, not on the administrative agency. He may or may not accept the agency's recommendation. If he does, seizures are made and libels are instituted. But the seizures and suits are dependent on the discretion of the Attorney General.

It is said that these multiple seizure decisions of the Administrator can cause irreparable damage to a business. And so they can. The impact of the initiation of judicial proceedings is often serious. Take the case of the grand jury. It returns an indictment against a man without a hearing. It does not determine his guilt; it only determines whether there is probable cause to believe he is guilty. But that determination is conclusive on the issue of probable cause. As a result the defendant can be arrested and held for trial. See *Beavers* v. *Henkel,* 194 U. S. 73, 85; *Ex parte United States,* 287 U. S. 241, 250. The impact of an indictment is on the reputation or liberty of a man. The same is true where a prosecutor files an information charging violations of the law. The harm to property and business can also be incalculable by the mere institution of proceedings. Yet it has never been held that the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in instituting suit in the courts. Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination. *Phillips* v. *Commissioner,* 283 U. S. 589, 596–597; *Bowles* v. *Willingham,* 321 U. S. 503, 520; *Yakus* v. *United States,* 321 U. S. 414, 442–443.

One of the oldest examples is the summary destruction of property without prior notice or hearing for the pro-

tection of public health. There is no constitutional reason why Congress in the interests of consumer protection may not extend that area of control. It may conclude, as it did here, that public damage may result even from harmless articles if they are allowed to be sold as panaceas for man's ills. A requirement for a hearing, as a matter of constitutional right, does not arise merely because the danger of injury may be more apparent or immediate in the one case than in the other. For all we know, the most damage may come from misleading or fraudulent labels. That is a decision for Congress, not for us. The decision of Congress was that the administrative determination to make multiple seizures should be made without a hearing. We cannot say that due process requires one at that stage.

*Second.* The District Court had no jurisdiction to review the administrative determination of probable cause.

The determination of probable cause in and of itself had no binding legal consequence any more than did the final valuation made by the Interstate Commerce Commission in *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299. It took the exercise of discretion on the part of the Attorney General, as we have pointed out above, to bring it into play against appellee's business. Judicial review of such a preliminary step in a judicial proceeding is so unique that we are not willing easily to infer that it exists.

Judicial review of this preliminary phase of the administrative procedure does not fit the statutory scheme nor serve the policy of the Act. Congress made numerous administrative determinations under the Act reviewable by the courts.[6] But it did not place the finding of probable cause under § 304 (a) in that category. This highly

---

[6] Review of an order of the Administrator refusing to permit an application for a new drug to become effective or suspending the effectiveness of an application is authorized in § 505 (h), 21 U. S. C. § 355 (h). Orders of the Administrator in connection with issuing,

selective manner in which Congress has provided for judicial review reinforces the inference that the only review of the issue of probable cause which Congress granted was the one provided in the libel suit. Cf. *Switchmen's Union* v. *Board,* 320 U. S. 297, 305–306.

The purpose of the multiple seizure provision is plain. It is to arrest the distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. The public therefore has a stake in the jurisdictional issue before us. If the District Court can step in, stay the institution of seizures, and bring the administrative regulation to a halt until it hears the case, the public will be denied the speedy protection which Congress provided by multiple seizures. It is not enough to say that the vitamin preparation in the present case is not dangerous to health. This preparation may be relatively innocuous. But the statutory scheme treats every "misbranded article" the same in this respect—whether it is "dangerous to health," or its labeling is "fraudulent," or materially "misleading to the injury or damage of the purchaser or consumer." [7] What we do today determines the jurisdiction of the District Court in all the cases in that category. If the court in the present case can halt all multiple seizures but one, so can the court in other cases. The means which Congress provided to protect consumers against the injurious consequences of protracted proceedings would then be seriously impaired. Congress weighed the potential injury to the public from misbranded articles against the injury to the purveyor of the article from a temporary interference with its distribution and decided in favor of the speedy, preventive device of multiple seizures. We would impair or destroy the effectiveness

amending, or repealing regulations under §§ 401, 403 (j), 404 (a), 406 (a) and (b), 501 (b), 502 (d), 502 (h), 504, 604 are expressly made reviewable by § 701 (e) and (f), 21 U. S. C. § 371 (e) and (f).

[7] See § 304 (a) note 3, *supra.*

of that device if we sanctioned the interference which a grant of jurisdiction to the District Court would entail. Multiple seizures are the means of protection afforded the public. Consolidation of all the libel suits so that one trial may be had [8] is the relief afforded the distributors of the articles.[9]

*Reversed.*

MR. JUSTICE BURTON concurs in the result.

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

While I agree with the Court as to the constitutional and statutory issues canvassed in its opinion, I am unable

---

[8] Sec. 304 (b) provides in part:

"When libel for condemnation proceedings under this section, involving the same claimant and the same issues of adulteration or misbranding, are pending in two or more jurisdictions, such pending proceedings, upon application of the claimant seasonably made to the court of one such jurisdiction, shall be consolidated for trial by order of such court, and tried in (1) any district selected by the claimant where one of such proceedings is pending; or (2) a district agreed upon by stipulation between the parties. If no order for consolidation is so made within a reasonable time, the claimant may apply to the court of one such jurisdiction, and such court (after giving the United States attorney for such district reasonable notice and opportunity to be heard) shall by order, unless good cause to the contrary is shown, specify a district of reasonable proximity to the claimant's principal place of business, in which all such pending proceedings shall be consolidated for trial and tried. Such order of consolidation shall not apply so as to require the removal of any case the date for trial of which has been fixed. The court granting such order shall give prompt notification thereof to the other courts having jurisdiction of the cases covered thereby."

[9] Congress has granted distributors through the provision for consolidation of all libel suits the measure of relief which courts at times grant through a stay of multiple actions. See *Landis* v. *North American Co.*, 299 U. S. 248.

to answer MR. JUSTICE JACKSON's dissent, and I must therefore yield to it.

Of course Congress may constitutionally vest judicially unreviewable discretion in an executive agency to initiate multiple suits in order to stop trafficking in pernicious drugs or even in those that are harmless, where efficacy is misrepresented. I agree that it has done so in the Federal Food, Drug, and Cosmetic Act of 1938. 52 Stat. 1040, 21 U. S. C. § 301 *et seq.* But it does not at all follow that Congress has thereby cut off the right of access to the courts to prove that the enforcing agency has not acted within the broadest bounds of fair discretion, rare as the occasion may be for such an attempt and however improbable its success.

Such I understand to be the nature of the proceedings below and such the basis of the District Court's decree. Unless we can say, as I cannot, that the findings in support of it have no support in the evidence, we should not hold that the court below was without jurisdiction to entertain the suit.

The limited claim which the District Court sustained falls precisely within the qualification left open by this Court in a leading case sustaining the power of Congress to vest unreviewable discretion in executive agencies. When the Court was urged to deny this power of Congress and "extreme cases" were put showing "how reckless and arbitrary might be the action of Executive officers," the Court made this answer:

> "It will be time enough to deal with such cases as and when they arise. Suffice it to say, that the courts have rarely, if ever, felt themselves so restrained by technical rules that they could not find some remedy, consistent with the law, for acts, whether done by government or by individual persons, that violated natural justice or were hostile to the fundamental

principles devised for the protection of the essential rights of property." *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177, 195.

Mr. Justice Harlan, speaking for the Court, cast its thought in the language current at the time. But the thought behind the words is not outmoded and controls, I believe, the case before us.

Mr. Justice Jackson, dissenting.

The Court does not deal at all with what appears to be the ultimate issue decided by the court below.

The trial court of three judges wrote no opinion but made forty-three detailed findings of fact which would require twenty of these printed pages to reproduce and which summarize a 1,500-page record of a long trial. Those findings are made largely on undisputed evidence and on evidence from government sources. This Court does not criticize or reverse any of them.

The substance of these is to find that the Government instituted a multiplicity of court actions, with seizures in widely separated parts of the country, with a purpose to harass appellee and its dealers and intending that these actions and the attendant publicity would injure appellee's business *before any of the issues in such cases could be tried.* This, the court held, was justified by no emergency, the product being, at worst, harmless and having been marketed for years with knowledge of the Department.

Assuming as I do that the Act on its face is not constitutionally defective, the question remains whether it has been so misused by refusal of administrative hearing, together with such irreparable injury in anticipation of judicial hearing, as to deny appellee due process of law or to amount to an abuse of process of the courts.

The Government has sought and received from this Court protection against a multiplicity of suits under

circumstances where injury was less apparent than in this. *Landis* v. *North American Co.,* 299 U. S. 248. The holding of the court below and the contention of the appellee here that the Government is not entitled to so apply the statute as to bring multiple actions designed to destroy a business before it can be heard in its own defense is not frivolous, to say the least.

I am constrained to withhold assent to a decision that passes in silence what I think presents a serious issue.