**LOUISVILLE & NASHVILLE RAILROAD CO., Plaintiff,**

v.

**John M. SULLIVAN et al., Defendants.**

**Civ. A. No. 79–0485.**

United States District Court, District of Columbia.

June 18, 1979.

Dennis G. Lyons, James R. McAlee, S. Mark Tuller, Andrew Butz, Washington, D. C., for plaintiff.

John Oliver Birch, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

Louisville & Nashville Railroad Co. ("L&N") has requested the Court to enjoin the operation of an emergency safety order ("Order") which was issued by the Administrator of the Federal Railroad Administration ("FRA") on February 7, 1979, under 45 U.S.C. § 432 without notice or a prior hearing and which substantially affects the Railroad's functions. L&N has moved for summary judgment and injunctive relief on the ground that the Order exceeds the Administrator's authority. L&N accepts for purposes of its motions the accuracy of the lengthy factual findings which accompanied the Order. A purely legal issue is presented and the motions are ripe for decision after full briefs and argument.

### I.

The Order under attack is by far the most sweeping order ever issued under the authority of Section 432. Among other things, it places a 30-mile-per-hour speed limit on all trains carrying hazardous materials over tracks owned or leased by L&N, requires that L&N double the frequency of the track inspections it must perform under 49 C.F.R. Part 213, and directs that as soon as practicable the company inspect on foot all of the track over which it transports hazardous material. The "emergency situation" that induced this directive was the railroad's condition which had caused a series of recent derailments, most of which seem to have resulted from track and related deficiencies. These derailments had entailed serious losses of life and property, as well as evacuations of large numbers of people. Shortly after the Order was issued, *ex post facto* hearings were initiated by FRA, as prescribed by the statute. Following a few days of testimony, however, this

proceeding was terminated by mutual consent. Two months later, the hearings were once again reconvened, and apparently continue to date.

Section 432 authorizes the Administrator in an "emergency situation" to issue an *ex parte* order prohibiting the further use of a specified railroad facility or piece of equipment until the identified unsafe condition is corrected. Although the Order in dispute here recites findings of equipment deficiencies in L&N's system, those deficiencies do not appear to have been or to be FRA's primary concern. Rather, the Order directs its main attention at L&N's tracks, a "facility" within the meaning of the Section. The Section reads as follows:

> If through testing, inspection, investigation, or research carried out pursuant to this subchapter, the Secretary determines that any facility or piece of equipment is in unsafe condition and thereby creates an emergency situation involving a hazard of death or injury to persons affected by it, the Secretary may immediately issue an order, without regard to the provisions of section 431(b) of this title, prohibiting the further use of such facility or equipment until the unsafe condition is corrected. Subsequent to the issuance of such order, opportunity for review shall be provided in accordance with section 554 of Title 5.

L&N contends that the February 7, 1979, Order is defective in several respects. First, plaintiff believes that the Order did not respond to the existence of any "emergency situation." Second, the Railroad maintains that the Order improperly fails to designate any particular segment or segments of the L&N track as being defective. Rather, the Order applies to L&N's entire 10,600 miles of track, which trackage, according to plaintiff, could not conceivably be defective in its entirety. Third, plaintiff contends that the Order is regulatory, not prohibitory, and therefore does not fit within the express terms of Section 432. Finally, L&N argues that the Order improperly fails to indicate how L&N can correct the unsafe conditions so generally identified in the Order.

According to plaintiff, the open-ended nature of the Order as promulgated on February 7 has been exacerbated by the manner in which FRA has been administering the Order. When L&N received the Order, it assumed that once it could establish that a segment of its track met existing track safety standards, the Order would then be lifted as to that segment. Accordingly, L&N made several applications for relief, but most of them have encountered unexpected difficulties.

For instance, L&N requested, at various dates commencing March 1, 1979, that modifications be made in the Order with respect to some 1350 miles of its track. L&N's requests represented that these segments had been inspected and had been brought up to full compliance with FRA's Track Safety Standards. At oral argument, the Court took note of the fact that, as of June 5, 1979, these requests were still under agency consideration. Government counsel then indicated that the Administrator—in deciding whether or not to lift particular portions of the Order—considers, not only track conditions, but also *inter alia* the adequacy of the Railroad's training and maintenance programs and the extent to which the Railroad disciplines employees who violate safety standards; all of this in a generalized effort to upgrade the lower levels of L&N's management to such standards of performance as the Administrator in his subjective judgment might deem appropriate.

On June 11, 1979, FRA filed a revealing Partial Removal Order ("PRO") which simply reaffirmed these statements of counsel. The PRO made painfully clear the open-ended nature of the prohibitions imposed and the uncertainty and lack of precision which apparently govern the Order's present and future application. According to the PRO, before any portion of L&N's track will be completely released from all of the Order's prohibitions (including the crucial limitation on speed), FRA must perform "a thorough investigation of all aspects of railroad operations over that seg-

ment that bear on safety, including the condition of track and equipment, adequacy of training and testing of L&N operating personnel, L&N compliance with Federal safety regulations and its own rules, accident history, and the volume and character of hazardous materials moved." Apparently, only when completely satisfied on all these points will the FRA conclude that its February 7, 1979, Order should be lifted.

The Administrator applied these standards and in the PRO lifted the Order with respect to the segment of L&N's track between Nashville, Tennessee and Birmingham, Alabama. The FRA has also shown a willingness to permit some partial relaxation of the original Order's conditions—such as the obligation to walk the tracks—when L&N demonstrates that it has properly identified its track safety problems, but until all the other aforementioned conditions are met the most severe aspect of the Order—the speed limit requirement—remains in effect.

## II.

Whether or not an "emergency situation" existed on February 7, 1979, need not be considered. Perhaps the Administrator was initially justified by an emergency situation to enter the sweeping prohibitory Order of February 7, 1979, without a hearing and without having particularized the segments of trackage, if any, which the agency considered defective. Such conclusion is far from inevitably correct, however, given the comments of the majority of the Court of Appeals panel that reviewed this Court's denial on February 10 of L&N's request for a temporary restraining order. *Louisville & Nashville R. R. Co. v. Sullivan*, No. 79–1171 (D.C.Cir. Feb. 26, 1979), *vacated en banc* (April 4, 1979). Moreover, properly conceived, the restrictions placed upon the L&N's use of its track might be viewed as if they "prohibit[ ]" the use of a facility. The Court need not, however, decide any of these issues, for the Administrator did not satisfy two further requirements of Section 432.

The first requirement arises from the nature of the Order under review here and derives both from the terms of Section 432 and the dictates of the Due Process Clause of the Fifth Amendment. This was that the FRA specify, in the initial Order itself or shortly thereafter, the precise corrective steps which the L&N had to take to eliminate the unsafe conditions in its trackage and thus to obtain relief from the Order. This the FRA did not do and still has not done. Second and relatedly, there is the fact that nothing in Section 432 authorizes the FRA to conduct a sweeping and open-ended review of L&N's management techniques, personnel policies, or overall "operating philosophy." But, such is the practical effect of the standards being used by the Administrator in deciding whether or not the Order should be lifted. Conditions of this sort are not only purely subjective but also are impermissible under the terms of the statute which speaks only of defects in a railroad's "equipment" or "facilities," not of deficiencies in a railroad's management, personnel philosophy, or general operational techniques.

Most emergency statutes, such as the one involved here, follow a familiar pattern. Congress recognizes that situations arise where the interests of safety require that prompt prohibitory action be taken without the benefit of hearings or elaborate findings. The interests of the public in these situations are paramount and therefore the relevant expert agencies are given the discretion and authority to take such immediate steps as are needed to bring the safety threat under control. Typically, such situations involve a discrete fault—such as here a designated facility or piece of equipment—which can be brought without too much hardship under a precise prohibition until corrected. Not surprisingly, Congress usually writes these emergency prohibitory powers broadly so as to safeguard the public in all such conceivable situations as may arise. *See generally Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599–600, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *R. A. Holman & Co. v. SEC*, 112 U.S.App.D.C. 43, 47–48, 299 F.2d 127, 131–32, *cert. denied,*

370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

 Due process concerns, however, cannot be disregarded, even in emergency situations. *See generally* Freedman, *Summary Action by Administrative Agencies,* 40 U.Chi.L.Rev. 1, 5–26 (1972). What the Constitution in this kind of case requires is that a hearing "be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Where a discrete, manageable, well-identified, specific safety hazard is involved, an immediate hearing following issuance of the emergency order will usually suffice. Such a hearing would have a clear focus, could usually be conducted within a short time frame, and itself would normally serve to demonstrate that the challenged condition has been remedied and that the order should be lifted. On the other hand, where the emergency order, as in this instance, (1) seeks to induce a comprehensive series of managerial and operational changes in order to meet an ill-defined and over-generalized emergency problem, and (2) does not, with sufficient precision, indicate the means by which the Railroad can get the directive lifted, the statutorily proscribed *ex post facto* hearing fails to satisfy the requirements of due process. L&N is seriously affected by the Order. Its traffic is disrupted, its revenues diminished, and no relief appears to be in sight. Yet, because of the diffuse and overbroad nature of the Order, a long and unfocused hearing is what both parties now expect. In the meantime, the Order stays in effect and permits the Administrator, despite the passage of considerable time, to continue in his failure to identify what trackage he believes needs to be corrected and to continue to decline to inform L&N what specific action would establish that corrective action within the meaning of the statute had been taken. Given this combination of circumstances, the Fifth Amendment requires that the Administrator, in the Order itself or shortly thereafter, identify with particularity the kinds of corrective action which L&N can take to remedy the defects in its trackage. And, as noted before, the conditions which FRA can in this manner impose may not relate to defects in L&N's management, personnel or general operating policies, as opposed to defects in L&N's tracks. Since FRA has failed to satisfy these requirements, its Order cannot be permitted to stand.

 In sum, the Court concludes that the February 7 Order, on its face and as administered, violates the requirement of Section 432 that the Order relate solely to a "facility or piece of equipment" being "in unsafe condition," the further requirement of Section 432 that the Order prohibit "the further use of [a] facility or equipment until the unsafe condition is corrected," and the dictates of the Fifth Amendment.

An emergency situation may well still exist. It should, however, be dealt with in far more concrete and specific terms. The Order exceeds the authority granted the Administrator under Section 432 and is hereby declared to be illegal. Nothing herein prohibits the immediate issuance of a properly drawn order, directed to any persisting emergency.

For the aforementioned reasons, L&N's motion for summary judgment is granted.